# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| FUTURESELECT PORTFOLIO MANAGEMENT, INC., FUTURESELECT PRIME ADVISOR II LLC, THE MERRIWELL FUND, LP, and TELESIS IIW, LLC, | ) ) ) ) ) | No. 68130-3-I |
| Appellants, | ) ) ) | |
| v. | ) ) | |
| TREMONT GROUP HOLDINGS, INC., TREMONT PARTNERS, INC., OPPENHEIMER ACQUISITION CORPORATION, MASSACHUSETTS MUTUAL LIFE INSURANCE CO., GOLDSTEIN GOLUB KESSLER LLP, ERNST & YOUNG LLP and KPMG LLP, | ) ) ) ) ) ) ) ) ) | PUBLISHED OPINION  FILED: August 12, 2013 |
| Respondents. | ) ) ) | |

VERELLEN, J. —Bernard Madoff's incredible "success" as an investor spurred some investment firms to contract with Madoff to manage their "feeder funds."[1] An investment firm sold such funds to a group of local investors, who lost $195 million when Madoff's notorious Ponzi scheme collapsed.

---

[1] A "feeder fund" is a structure "commonly associated with hedge funds and is used to pool together assets from [a variety of] investors in order to keep costs down, achieve better economies of scale and better tax efficiencies. Investors place their money in one of several funds, known as 'feeders'. The feeders, in turn, invest their assets in one 'master fund,' which makes all the investment decisions for the portfolio." Lexicon, FIN. TIMES, http://lexicon.ft.com/Term?term=master_feeder-fund (last visited July 30, 2013).

The investors (FutureSelect) sued the investment firm (Tremont), its corporate parent (Oppenheimer) and grandparent (Mass Mutual), as well as an auditor (Ernst & Young) for Washington securities fraud and tort claims. The King County Superior Court dismissed all of the claims pursuant to CR 12(b)(6) and the claims against Oppenheimer also for lack of personal jurisdiction.

Ten points drive the outcome of this appeal. First, the "most significant relationship" choice-of-law standards for misrepresentation and fraud claims favor the application of Washington law to all but one of the claims asserted.

Second, under CR 12(b)(6) we consider the allegations of the complaint and consistent hypothetical facts, but not limited samples of disputed transactional documents.

Third, under the generous CR 12(b)(6) standard, the investors adequately allege they relied upon representations and omissions by the investment firm in deciding to invest and maintain their investments.

Fourth, an auditor may be liable as a "seller" under The Securities Act of Washington (WSSA), chapter 21.20 RCW, if the auditor provides false and misleading information that was a "substantial contributive factor" in investors' decisions to invest and maintain their investments.

Fifth, the corporate parent and grandparent of an investment firm may face liability as a "control person" under the WSSA if they actively managed and controlled key aspects of the investment firm's operations, including the specific investments and representations that give rise to the investor's claims.

2

Sixth, the allegation that the investment firm failed to conduct the due diligence and monitoring of Madoff that it promised its investors states a negligent misrepresentation claim.

Seventh, in their role as limited partners, the investors lack standing to pursue the derivative claim that the investment firm, as the general partner, negligently managed the limited partnerships (applying Delaware law).

Eighth, the corporate parent and grandparent may be liable for the acts of the investment firm under an agency theory if they actually controlled and actively managed key operations of the investment firm, but apparent agency requires that the parent or grandparent held the subsidiary out to others as their agent.

Ninth, an auditor may be liable for negligent misrepresentation if the auditor included untrue statements and omissions in materials provided to the limited partners knowing that the limited partners relied upon those materials.

Finally, the Washington contacts of the investment firm may be imputed to its parent corporation for purposes of long-arm jurisdiction if the parent actively managed and controlled key aspects of the investment firm's activities in Washington, which activities gave rise to the claims of the investors.

We conclude that FutureSelect's complaint adequately alleges WSSA claims against all respondents. Moreover, the complaint adequately alleges negligent misrepresentation claims against Tremont and Ernst & Young, agency claims against Mass Mutual and Oppenheimer, and an apparent agency claim against Mass Mutual. Based upon the allegations of the complaint, the exercise of long-arm jurisdiction over Oppenheimer does not offend due process.

We affirm the dismissal of FutureSelect's apparent agency claim against Oppenheimer and its negligence claim against Tremont. We reverse the dismissal of all other claims.

## FACTS

Because this is an appeal from a trial court order dismissing claims pursuant to CR 12(b)(6), we focus on the facts as alleged in the complaint.

*The Parties*

Delaware corporation FutureSelect Portfolio Management Inc. is the operations manager of Delaware limited liability companies FutureSelect Prime Advisor II and Telesis IIW and Delaware limited partnership The Merriwell Fund (collectively FutureSelect). These entities have their principal place of business in Redmond, Washington.

Delaware corporation Tremont Group Holdings Inc. is the parent holding company of Connecticut corporation Tremont Partners Inc. and has its principal office in New York.[2] Tremont was the general partner in Delaware limited partnerships the Rye Select Broad Market Fund[3] (Broad Market), Rye Select Broad Market Prime Fund (Prime), and Rye Select Broad Market XL Fund (XL) (collectively Rye Funds).

Delaware corporation Oppenheimer Acquisition Corporation (Oppenheimer) owns subsidiary entity OppenheimerFunds Inc. Oppenheimer acquired Tremont in

---

[2] Because the distinction between Tremont Group Holdings Inc. and Tremont Partners Inc. has no impact on the issues raised in this appeal, we refer to them collectively as Tremont.

[3] Formerly American Masters Broad Market Fund.

2001 and made it a wholly owned subsidiary. Employees of Oppenheimer and OppenheimerFunds Inc. served as Tremont board members and officers.

Massachusetts corporation Massachusetts Mutual Life Insurance Company (Mass Mutual) wholly owns Oppenheimer. Mass Mutual conducts business in Washington.

Delaware limited partnership Ernst & Young is an accounting firm conducting business worldwide, including Washington. Ernst & Young audited the Broad Market and Prime funds from 2000 to 2003 and issued annual financial statements.[4] Ernst & Young disseminated unqualified audit opinions[5] to the Rye Funds partners, including FutureSelect. Ernst & Young is headquartered in New York.

*FutureSelect Invests with Tremont*

Tremont was one of a limited number of investment firms that afforded investors access to feeder funds managed by Bernard L. Madoff Investment Securities LLC (Madoff). Investors accessed the funds by becoming limited partners in Rye Funds partnerships managed by Tremont Partners Inc. as general partner. The Rye Funds partnerships created accounts managed by Madoff. The Rye Funds' agreements with Madoff did not require him to disclose key details of how he allegedly invested the accounts. In order to

---

[4] FutureSelect also filed claims against the other firms that audited the Rye Funds, Goldstein Golub Kessler LLP and KPMG LLP. However, those claims are not at issue in this appeal because FutureSelect settled its claims against Goldstein Golub Kessler and the trial court compelled separate arbitration of FutureSelect's claims against KPMG.

[5] An "unqualified audit opinion" represents the auditor's opinion that the entity's financial statements are free of material misstatements and are represented fairly in accordance with the generally accepted accounting standards. See, e.g., Grant Thornton, LLP v. Office of Comptroller of the Currency, 379 U.S. App. D.C. 419, 514 F.3d 1328, 1340-41 (2008).

invest in funds managed by Madoff, FutureSelect became a limited partner in the Rye Funds and invested approximately $195 million between 1998 and 2007. The Rye Funds assets managed by Madoff were lost as a result of his Ponzi scheme.

A Tremont representative visited FutureSelect principal Ron Ward in Redmond in 1997 to solicit investment in the Rye Funds. Ward soon visited Tremont's New York office and discussed the funds and Madoff. In both meetings, "Tremont told Ward that the Rye Funds invested all of their assets with Madoff and Madoff was given complete investment discretion over those assets, subject to Tremont's oversight and ongoing due diligence."[6] Tremont provided Ward written materials, including "the 1996 audited financial statements of Broad Market and Broad Market Prime prepared by [accounting firm Goldstein Golub Kessler LLP], which certified that the funds had tens of millions in assets.[7]

Relying on "Tremont's representations that it had a comprehensive understanding of Madoff's operations and conducted continuous monitoring and oversight" and on Goldstein Golub Kessler's unqualified audit report, FutureSelect invested in the Rye Funds.[8] Ward and Tremont communicated monthly thereafter about Madoff and the Rye Funds.

Ward regularly visited Tremont in New York. During the visits, Tremont "represented to Ward that its ongoing oversight and testing of Madoff were satisfactory

---

[6] Clerk's Papers at 9-10.

[7] Clerk's Papers at 10.

[8] Clerk's Papers at 10. FutureSelect and Tremont entered into numerous agreements in conjunction with FutureSelect's investments. These include the limited partnership agreements that FutureSelect entered in order to invest in each of the Rye Funds. The limited partnership agreements included exculpatory provisions relating to Tremont's role as general partner.

in every respect."[9] Ward learned from Tremont in June 2000 that the United States Securities and Exchange Commission reviewed Madoff and identified "no issues" of concern.[10] After Mass Mutual acquired Tremont in 2001, Tremont told Ward that "Mass Mutual and its investment banker . . . had sent due diligence teams who evaluated Madoff's operations and had been completely satisfied."[11] In both 2005 and 2007, Ward had "lengthy phone calls" with Tremont employee Bob Schulman "reviewing Tremont's ongoing due diligence of Madoff."[12]

Both during and after the initial 1997 meeting, Tremont explained the specific monitoring it purported to conduct on Rye Funds accounts managed by Madoff. The steps Tremont claimed to take were detailed in a July 10, 2001 letter sent to Ward. The letter claimed that each month,

> [w]e record the purchases and sales by security and analyze whether the purchase and sale orders on the individual securities were within the published traded range that particular day. We also analyze the trading volume by stock to calculate the percentage of the overall activity. Once we have reviewed each account, we then compare the accounts to each other to insure that all accounts are treated equally.[13]

Tremont also claimed to monitor Madoff's option activity and the timing of his investments. FutureSelect received annual audited financial statements for the Rye Funds prepared by accounting firms Goldstein Golub Kessler, KPMG LLP, and Ernst & Young. Ernst & Young specifically audited the Broad Market and Prime funds from 2000 through 2003.

---

[9] Clerk's Papers at 11.

[10] Clerk's Papers at 11.

[11] Clerk's Papers at 11.

[12] Clerk's Papers at 12.

[13] Clerk's Papers at 12.

Madoff later admitted that he never invested clients' funds in any securities but instead deposited the funds into a bank account for personal use. He used his clients' funds to pay other clients who requested redemptions.

FutureSelect filed its complaint in King County Superior Court, alleging that (1) the respondents violated the WSSA, (2) Tremont committed the torts of negligence and negligent misrepresentation, (3) Oppenheimer and Mass Mutual were liable for Tremont's torts under theories of agency or apparent agency, and (4) Ernst & Young was liable for the tort of negligent misrepresentation.

Respondents moved to dismiss on the basis that the complaint failed to state a claim for which relief could be granted. Tremont, Oppenheimer and Ernst & Young argued for dismissal on the grounds of forum non conveniens. Oppenheimer argued that the court did not have personal jurisdiction. The trial court dismissed all of FutureSelect's claims.[14]

FutureSelect appeals.

## ANALYSIS

*Choice of Law*

Because the transactions at issue did not all occur in Washington, we must first determine the law applicable to each claim.[15] Where Washington law conflicts with the

---

[14] The trial court orders dismissing claims against Ernst & Young and Mass Mutual specified that dismissal was pursuant to CR 12(b)(6). The orders dismissing claims against Tremont and Oppenheimer did not cite a specific rule. In its briefing to this court, Tremont acknowledges that the trial court dismissed under CR 12(b)(6). Oppenheimer argues that FutureSelect's claims were dismissed based on both CR 12(b)(6) and CR 12(b)(2) (lack of personal jurisdiction).

[15] Under the principle of dépeçage, different issues in a single case arising out of a common nucleus of facts may be decided according to the substantive law of different states. See Experience Hendrix, LLC v. HendrixLicensing.com, LTD, 766 F. Supp. 2d

law of another relevant state, this court determines which state has the most significant relationship to the action.[16] If more than one state has a significant relationship and the contacts are "evenly balanced" between states, the court evaluates "the interests and public policies of the concerned states, to determine which state has the greater interest in determination of the particular issue."[17]

Washington courts have adopted section 145 of the Restatement (Second) of Conflicts of Laws, which sets forth the general principles of the "most significant relationship" test.[18] It provides that the rights and liabilities of the parties with respect to an issue "are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."[19] This general rule is supplemented by related sections of the Restatement applying the most significant relationship standard to particular categories

---

1122, 1136 (W.D. Wash. 2011) (citing Brewer v. Dodson Aviation, 447 F. Supp. 2d 1166, 1175 (W.D. Wash. 2006) (recognizing that Washington courts might "apply the law of one forum to one issue while applying the law of a different forum to another issue in the same case" (quoting KELLY KUNSCH, 1 WASHINGTON PRACTICE § 2.21 (4th ed. 1997 & Supp. 2008)))); see also Singh v. Edwards Lifesciences Corp., 151 Wn. App. 137, 143, 210 P.3d 337 (2009) (indicating that, having abandoned the lex loci delicti rule, Washington courts now "decide which law applies by determining which jurisdiction has the most significant relationship *to a given issue*" (emphasis added)).

[16] Johnson v. Spider Staging Corp., 87 Wn.2d 577, 580, 555 P.2d 997 (1976); Martin v. Goodyear Tire & Rubber Co., 114 Wn. App. 823, 828, 61 P.3d 1196 (2003).

[17] Zenaida-Garcia v. Recovery Sys. Tech., Inc., 128 Wn. App. 256, 260-61, 115 P.3d 1017 (2005).

[18] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971).

[19] RESTATEMENT § 145(1). The Restatement provides the following broad choice-of-law policy considerations: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states . . . , (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied." RESTATEMENT § 6(2).

of claims because it is possible "to state rules of greater precision" as to those categories.[20] The most significant relationship test includes more precise standards for claims of misrepresentation and fraud as set forth in section 148.[21]

Respondents argue that section 148 does not apply to FutureSelect's claims but present no compelling rationale for restricting our analysis to the more general criteria of section 145, where the more precise section 148 criteria fit the alleged claims. No controlling cases limit the most significant relationship test to the section 145 criteria.

Ernst & Young contends our Supreme Court "declined" to adopt section 148 in tort cases, citing Southwell v. Widing Transportation, Inc.[22] However, the Southwell court did not reject section 148. Rather, it found that the parties failed to present "a record that is sufficiently developed to enable us to undertake the factual analysis necessary for proper resolution of the conflicts issues involved."[23] The court noted that "the general principles" enunciated in section 6 and section 145 apply to choice-of-law issues for claims sounding in tort[24] but did not reject consideration of any of the more precise standards cross-referenced in the comments to section 145, including the standards of section 148. Southwell also makes clear that evaluation of a state's contacts is not limited to a mechanical application of the section 145 factors:

> These contacts are to be evaluated according to their relative importance with respect to the particular issue. The approach is not merely to count

---

[20] RESTATEMENT § 145 cmt. a.

[21] RESTATEMENT § 148.

[22] 101 Wn.2d 200, 676 P.2d 477 (1984).

[23] Id. at 205.

[24] Id. at 204.

contacts, but rather to consider which contacts are most significant and to determine where these contacts are found.[25]

Tremont contends that Haberman v. Washington Public Power Supply System requires application of only the section 145 factors in a most significant relationship test.[26] This is not a precise reading of Haberman. In that case, "[n]o party contend[ed] that another state's securities act applie[d]"[27] and the court rejected the argument that "WSSA should not be applied extraterritorially to out-of-state defendants or transactions."[28] The Haberman court cited Southwell in discussing the most significant relationship standard but did not directly refer to the Restatement.[29]

Even though no Washington court has formally adopted section 148, we may still refer to that provision for guidance.[30] We conclude that section 148 is instructive in this case. Section 148 is best viewed as a refinement of the section 145 criteria,

---

[25] Id.

[26] 109 Wn.2d 107, 744 P.2d 1032, 750 P.2d 254 (1987).

[27] Id. at 135.

[28] Id. at 134.

[29] Id.

[30] See, e.g., Bank of America, NA v. Prestance Corp., 160 Wn.2d 560, 576 n.11, 160 P.3d 17 (2007) (recognizing cases where courts have considered the Restatement approach as persuasive "but declined to clearly articulate a rule adopting the Restatement approach" regarding Restatement (Third) of Property: Mortgages § 7.6 (1997)); Niemann v. Vaughn Cmty. Church, 154 Wn.2d 365, 381-82, 113 P.3d 463 (2005) (Supreme Court looked to Restatement (Third) of Trusts § 66 (2003) for guidance but did not expressly adopt it); Nivens v. 7-11 Hoagy's Corner, 133 Wn.2d 192, 202-03, 943 P.2d 286 (1997) (applying Restatement (Second) of Torts § 314A (1965), a section that was not formally adopted by a Washington court, as well as §§ 315 and 344, which were previously adopted); Bennett v. Hardy, 113 Wn.2d 912, 920, 784 P.2d 1258 (1990) (citing but not formally adopting Restatement (Second) of Torts § 874A (1979) as persuasive authority in adopting an analogous rule).

emphasizing more precise factors relevant to claims of misrepresentation or fraud.[31]

This is the express intent of the drafters of the Restatement and is consistent with decisions applying Washington law.[32] Section 148(2) sets forth six factors to assess which state has the most significant relationship to the dispute and to the parties:[33]

(a) the place, or places, where the [injured party] acted in reliance upon the defendant[s'] representations,

(b) the place where the [injured party] received the representations,

(c) the place where the defendant[s] made the representations,

(d) the domicil, . . . place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

---

[31] See In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig., 860 F. Supp. 2d 1062, 1074 (C.D. Cal. 2012) ("Because the factors listed in § 148 are specific to the fraud context and are a more detailed expression of the factors in § 145, the Court will focus its discussion on § 148."); Value House, Inc. v. MCI Telecomms. Corp., 917 F. Supp. 5, 6 (D.D.C. 1996) ("Section 145 contains the general principles with respect to tort cases, while Section 148 contains the factors specifically applicable in fraud and misrepresentation cases, such as . . . negligent misrepresentation.").

[32] This approach is also consistent with the analyses undertaken by the United States District Court for the Western District of Washington in Carideo v. Dell, Inc., 706 F. Supp. 2d 1122, 1128-29 (W.D. Wash. 2010) (in Washington's statutory Consumer Protection Act claims, § 148 "provides guidance" where reliance upon false or fraudulent representations is a substantial factor in inducing a plaintiff to purchase a defendant's goods or services) and Kelley v. Microsoft Corp., 251 F.R.D. 544, 552 (W.D. Wash. 2008) (applying § 148 to claims raising a conflict between Washington Consumer Protection Act and Illinois Consumer Fraud Act). The Carideo court relied in part on the Court of Appeals' analysis under § 148 in Schnall v. AT&T Wireless Servs., Inc. ,139 Wn. App. 280, 293-94, 161 P.3d 395 (2007), reversed in part on other grounds by Schnall v. AT & T Wireless Servs., Inc., 171 Wn.2d 260, 259 P.3d 129 (2011).

[33] Section 148(2) applies because "the plaintiff's action in reliance took place in whole or in part in a state [i.e., Washington] other than that where the false representations were made [i.e., New York]." RESTATEMENT § 148(2). Section 148(1) does not apply here because it is limited to situations where a "plaintiff's action in reliance took place in the state where the false representations were made and received." RESTATEMENT § 148(1).

> (f)    the place where the [injured party] is to render performance under a contract which [it] has been induced to enter by the false representations of the defendant[s].[34]

Although no mechanical standard governs the selection of the applicable law, one guideline is that when any two of those contacts are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues.[35] In addition, if the plaintiff is a corporation, the plaintiff's principal place of business (here, Washington) is a contact "of substantial significance when the loss is pecuniary," as it is in this case.[36] Furthermore, the place of reliance (here, Washington) is a more important contact than both the place of reception (Washington) and the place where the defendant made the representations (New York).[37]

A. FutureSelect's WSSA Claims

We first apply the most significant relationship choice-of-law factors to FutureSelect's WSSA claims.[38] Those claims focus upon allegations of misrepresentations or fraud.

---

[34] RESTATEMENT § 148(2).

[35] RESTATEMENT § 148 cmt. j.

[36] RESTATEMENT § 148 cmt. i.

[37] See RESTATEMENT § 148 cmt. g; see also Insituform Techs., Inc. v. Per Aarsleff A/S, 534 F. Supp. 2d 808, 815 (W.D. Tenn. 2008).

[38] There is an actual conflict between WSSA and New York's securities law, the Martin Act, N.Y. Gen. Bus. Law art. 23-A. Specifically, the WSSA affords FutureSelect a private cause of action; the Martin Act does not. See CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268, 275, 514 N.E.2d 116, 519 N.Y.S.2d 804 (1987). The Martin Act, nevertheless, does not preclude a private right of action for common law claims for fraud or otherwise, provided the claim is not entirely dependent on the Martin Act violation for its viability. Assured Guar. (U.K.) Ltd. v. J.P. Morgan Inv. Mgmt. Inc., 18 N.Y.3d 341, 353, 962 N.E.2d 765, 939 N.Y.S.2d 274 (2011).

FutureSelect asserts Tremont "made untrue statements of material fact," "misrepresented," and made "misstatements."[39] It asserts Oppenheimer controlled Tremont and "knew or should have known" that Tremont "omitted material facts and [made] untrue statements of material fact."[40] It alleges Mass Mutual controlled Tremont and "knew or should have known that Tremont's representations . . . omitted material facts and [made] untrue statements of material fact."[41] It also alleges Ernst & Young "made untrue statements of material facts and engaged in acts of fraud and deceit."[42]

We conclude that Washington has the most significant relationship to these claims. FutureSelect asserts that the documents and communications underlying its claims were provided or made available to it in its offices in Washington, including the partnership offering materials, subscription agreements, and Rye Funds audit reports. The complaint specifically states that "Tremont's relationship with FutureSelect began when a Tremont representative visited [FutureSelect principal] Ward in Redmond in 1997 to solicit FutureSelect's investment in the Rye Funds."[43] More generally, FutureSelect alleges that Tremont "disseminat[ed] offering materials, financial disclosures, audit reports and/or other written materials . . . through communications with representatives of FutureSelect"[44] and "made numerous misrepresentations and omissions to FutureSelect in the [s]tate of Washington and thereby injured FutureSelect

---

[39] Clerk's Papers at 31-32.

[40] Clerk's Papers at 33.

[41] Clerk's Papers at 34-35.

[42] Clerk's Papers at 36.

[43] Clerk's Papers at 9.

[44] Clerk's Papers at 8.

in this [s]tate."[45] The complaint specifically refers to a July 10, 2001 letter from Tremont to Ward in which "Tremont claimed to perform numerous procedures to confirm that the information Madoff was presenting to Tremont [about Rye Funds' investments] was accurate."[46]

FutureSelect contends Ernst & Young "disseminated unqualified audit opinions" and other materials to Tremont for delivery to FutureSelect in Washington, and "knew [FutureSelect was] receiving and relying on its audits of the funds."[47]

FutureSelect asserts that it acted in reliance upon the misrepresentations in Washington, where it is domiciled and has its principal place of business. As a result of these communications, FutureSelect alleges it entered into the Rye Fund partnerships, made ongoing decisions to maintain or increase its investments in those funds, and rendered performance under those partnership agreements from its place of business in Washington. Under the section 148 criteria, Washington has substantially more significant contacts than any other state.

B. Negligent Misrepresentation/Agency Claims

The negligent misrepresentation claim against Tremont and the related agency claims against Oppenheimer and Mass Mutual are premised on misrepresentation or fraud. FutureSelect alleges Tremont supplied and disseminated "false information."[48] It alleges that Oppenheimer "had the right to control Tremont[,] including how Tremont

---

[45] Clerk's Papers at 6.

[46] Clerk's Papers at 12.

[47] Clerk's Papers at 23.

[48] Clerk's Papers at 43.

offered investment products and advice, including the Rye Funds."[49] And it alleges

Mass Mutual had the "right to control . . . how Tremont offered investment products and

advice, including the Rye Funds."[50] The complaint recites that most of the

misrepresentations were directed to FutureSelect in Washington, that FutureSelect

acted in reliance upon the misrepresentations in Washington, and that FutureSelect was

damaged in Washington. Accordingly, Washington has the most significant contacts

with the subject matter of these claims.

FutureSelect's negligent misrepresentation claim against Ernst & Young alleges

that Ernst & Young "supplied information . . . that was false," "omitted material facts,"

"communicat[ed] such false information," and "disseminat[ed] false information" that

FutureSelect received in Washington.[51] Under the section 148 criteria, Washington and

New York both have significant contacts, but Washington's are more significant.[52]

---

[49] Clerk's Papers at 39.

[50] Clerk's Papers at 41.

[51] Clerk's Papers at 45-46. FutureSelect alleges in its tort claim that Ernst & Young "owed FutureSelect the duty to use reasonable care, or the competence or skill of a professional independent auditor, in conducting audits . . . and rendering audit opinions . . . in accordance with [generally accepted auditing standards]," and "failed to exercise reasonable care by negligently failing to conduct audits of the Rye Funds in accordance with [generally accepted auditing standards] and by failing to inquire into many crucial facts." Clerk's Papers at 45-46.

[52] There is an actual conflict of laws applicable to FutureSelect's negligent misrepresentation claim against Ernst & Young. New York law, unlike Washington law, requires near privity between an auditor and a plaintiff as a condition precedent to a negligent misrepresentation claim. Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 551, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985). To demonstrate near privity, a plaintiff must show (1) the auditor was aware when preparing its audit opinions that the opinions would be used for the plaintiff's particular purposes; (2) the auditor knew the plaintiff intended to rely on its audit opinions; and (3) the auditor engaged in direct conduct linking them to the plaintiff, evidencing the auditor's understanding that the plaintiff would rely on its opinion. Id.

FutureSelect's complaint expressly alleges Ernst & Young was aware that FutureSelect was in Washington, knew that its reports would be sent to Washington, and intended for FutureSelect to act in reliance upon the reports in Washington. Specifically, the complaint alleges that (1) with Ernst & Young's "consent and knowledge, Tremont used the audited financials prepared by the [a]uditors to solicit investors to the Rye Funds";[53] (2) Ernst & Young "knew and intended that FutureSelect would rely on their misrepresentations when it invested in the Rye Funds";[54] and (3) Ernst & Young knew and intended to supply such information for the benefit and guidance of FutureSelect" in its Rye Funds investment decisions. FutureSelect alleges that its injury occurred in Washington.[55] We conclude that Washington law applies to FutureSelect's tort claim against Ernst & Young.

## C. Negligence Claim

Delaware law applies to FutureSelect's negligence claim against Tremont. The Rye Funds are Delaware partnerships. The Rye Funds' internal affairs, such as the managing partner's duty to exercise reasonable care in managing the funds, are governed by the laws of that state.[56]

---

[53] Clerk's Papers at 20.

[54] Clerk's Papers at 37.

[55] Ernst & Young argues that when a misrepresentation is nationwide in scope, the location of the plaintiff and thus the location of the injury is fortuitous. See Kelley, 251 F.R.D. at 552; Bryant v. Wyeth, 879 F. Supp. 2d 1214, 1222-23 (W.D. Wash. 2012). But here, where the loss is pecuniary, the place of business of FutureSelect (also the location of the injury) is of substantial significance. RESTATEMENT § 148 cmt. i.

[56] See Rodriguez v. Loudeye Corp., 144 Wn. App. 709, 718, 189 P.3d 168 (2008) ("Shareholder claims involving a corporation's internal affairs are governed by the law of the state in which the corporation was incorporated.").

17

We conclude that Washington law applies to FutureSelect's WSSA claims against all respondents, its negligent misrepresentation claims against Tremont and Ernst & Young, and its agency claims against Mass Mutual and Oppenheimer. Delaware law applies to the negligence claim against Tremont.

*CR 12(b)(6)*

This court applies the de novo standard of review to a trial court's decision to dismiss pursuant to CR 12(b)(6).[57] Dismissal under CR 12(b)(6) is proper where "'it appears beyond doubt that the plaintiff can prove no set of facts, consistent with the complaint, which would entitle the plaintiff to relief.'"[58] We regard the plaintiff's allegations in the complaint as true, and consider hypothetical facts outside the record.[59] Under notice pleading standards, a complaint need contain only "(1) a short and plain statement of the claim showing that the pleader is entitled to relief and (2) a demand for judgment for the relief to which he deems himself entitled."[60] "'A pleading is insufficient

---

[57] Gaspar v. Peshastin Hi-Up Growers, 131 Wn. App. 630, 634, 128 P.3d 627 (2006).

[58] Lawson v. State, 107 Wn.2d 444, 448, 730 P.2d 1308 (1986) (internal quotation marks omitted) (quoting Bowman v. John Doe Two, 104 Wn.2d 181, 183, 704 P.2d 140 (1985)). A court may consider hypothetical facts not part of the formal record. Halvorson v. Dahl, 89 Wn.2d 673, 675, 574 P.2d 1190 (1978).

[59] Burton v. Lehman, 153 Wn.2d 416, 422, 103 P.3d 1230 (2005) (quoting Tenore v. AT&T Wireless Servs.,136 Wn.2d 322, 330, 962 P.2d 104 (1998)).

[60] CR 8(a). "Under notice pleading, plaintiffs use the discovery process to uncover the evidence necessary to pursue their claims." Putman v. Wenatchee Valley Med. Ctr. PS, 166 Wn.2d 974, 983, 216 P.3d 374 (2009). "All pleadings shall be so construed as to do substantial justice." CR 8(f).

when it does not give the opposing party fair notice of what the claim is and the ground upon which it rests.'"[61]

A. Additional Documents Provided by Tremont

As a threshold issue, we must decide which documents are pertinent to our determination of whether FutureSelect adequately states its claims under the CR 12(b)(6) and notice pleading standards. Most importantly in this case, Tremont relies heavily on examples of the partnership memoranda, limited partnership agreements, and subscription agreements to argue that FutureSelect fails to state a claim. The trial court expressly relied on these documents in dismissing FutureSelect's claims.[62]

"Documents whose contents are alleged in a complaint but which are not physically attached to the pleading may also be considered in ruling on a CR 12(b)(6) motion to dismiss," especially if "the parties do not dispute the authenticity of the documents the court considered and they do not constitute testimony."[63]

---

[61] Kirby v. City of Tacoma, 124 Wn. App. 454, 470, 98 P.3d 827 (2004) (internal quotation marks omitted) (quoting Dewey v. Tacoma Sch. Dist. No. 10, 95 Wn. App. 18, 23, 974 P.2d 847 (1999)).

[62] See Clerk's Papers at 3344 (order dismissing claims against Tremont) and Clerk's Papers at 3352-53 (dismissing claims against Mass Mutual) in which the trial court states it relied upon the declaration of Jason C. Vigna. That declaration, submitted in support of Tremont's motion to dismiss, includes as appendices sample copies of some limited partnership agreements, partnership memoranda, and subscription agreements for the Prime fund, the XL fund, and the Broad Market fund.

[63] Rodriguez, 144 Wn. App. at 726 & n.45. The court also explained that the trial court properly considered Loudeye's certificate of incorporation because it was a proper "subject of judicial notice" as a matter of public record and its validity was capable of "'accurate and ready determination.'" Id. at 726 (quoting ER 201(b)); see also P.E. Systems, LLC v. CPI Corp., 176 Wn.2d 198, 204-05, 289 P.3d 638 (2012).

But here, Tremont submitted only a small sampling of materials in conjunction with its motion to dismiss—one example of a partnership agreement, a subscription agreement, and a partnership memorandum for each Rye Fund. And the samples Tremont provided were from a period late in the parties' 10-year relationship. Further, at oral argument here, FutureSelect disputed the sample agreements' authenticity.

We decline to assume that the partnership memoranda, partnership agreements, and subscription agreements Tremont submitted are representative of the relevant documents throughout the parties' 10-year relationship. While documents of this type may become relevant to determine the merits of portions of FutureSelect's claims, or in narrowing or disposing of the claims in a summary judgment proceeding, the limited sampling of the documents submitted by Tremont should not be the basis for CR 12(b)(6) dismissal of the entirety of FutureSelect's claims against Tremont.

In evaluating FutureSelect's claims under CR 12(b)(6), we do not consider the sample documents offered by Tremont.

B. WSSA

The WSSA provides, in part:

It is unlawful for any person, in connection with the offer, sale[64] or purchase of any security, directly or indirectly:

> (1) To employ any device, scheme, or artifice to defraud;

> (2) To make any untrue statement of a material fact[65] or to omit to state a material fact necessary in order to make the statements made, in

---

[64] The terms "sale" and "sell" include "every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value." RCW 21.20.005(14).

[65] Under the WSSA a "material fact" is a fact that may affect the desire of investors to buy, sell, or hold the company's securities. Guarino v. Interactive Objects, Inc., 122 Wn. App. 95, 114, 86 P.3d 1175 (2004).

the light of the circumstances under which they are made, not misleading; or

(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.[66]

To establish a claim under the WSSA, an investor must prove that (1) the seller made material misrepresentations or omissions about the security and (2) the investor relied on those misrepresentations or omissions.[67] Such reliance must be reasonable under the surrounding circumstances.[68]

Our Supreme Court expanded seller liability beyond the "strict privity" standard to include persons who "substantially contribute" to a sale of securities.[69] Because the primary purpose of the WSSA is to protect investors, courts construe the statute liberally.[70]

C. Tremont

FutureSelect alleges Tremont claimed to have conducted due diligence into Madoff's operations and to have continually conducted regular oversight and review measures over the Rye Funds' Madoff investments:

---

[66] RCW 21.20.010.

[67] Hines v. Data Line Systems, Inc., 114 Wn.2d 127, 134-35, 787 P.2d 8 (1990); Stewart v. Estate of Steiner, 122 Wn. App. 258, 264, 93 P.3d 919 (2004); Graham-Bingham Irrevocable Trust v. John Hancock Life Ins. Co. USA, 827 F. Supp. 2d 1275, 1284 (W.D. Wash. 2011).

[68] Stewart, 122 Wn. App. at 265 n.9 (citing Clausing v. DeHart, 83 Wn.2d 70, 73, 515 P.2d 982 (1973) (adopting objective view of a "material fact" as "'a fact to which a reasonable [person] would attach importance in determining [his/her] choice of action in the transaction in question'" (emphasis omitted) (alterations in original))).

[69] Haberman, 109 Wn.2d at 131 (a "seller" under RCW 21.20.430(1) includes those whose participation was a substantial factor in the sales transaction).

[70] Kinney v. Cook, 159 Wn.2d 837, 844, 154 P.3d 206 (2007); Stewart, 122 Wn. App. at 264.

> Tremont emphasized in its offering materials, financial disclosures and direct correspondence and conversations with FutureSelect that it had conducted thorough due diligence of Madoff to verify, among other things, the existence of the assets Madoff claimed to hold and manage for Tremont's investors, and the occurrence of trades that Madoff claimed to execute on the investors' behalf.[71]

FutureSelect asserts that Tremont either failed to perform the monitoring it claimed or "uncovered evidence of Madoff's Ponzi scheme, and knowingly or recklessly misrepresented" the Rye Funds' assets.[72]

On these allegations, FutureSelect asserts Tremont violated the WSSA by making untrue statements of material fact in connection with the sale of a security:

> Specifically, in connection with offering the Rye Funds as an investment, Tremont misrepresented that Tremont had conducted due diligence on Madoff, was familiar with Madoff's operations, and was monitoring Madoff's transactions, internal controls, and operational risk; that the assets purportedly managed by Madoff on behalf of the Rye Funds existed and were appreciating; and that the trades Madoff purported to be making on behalf of Rye Funds occurred.[73]

Tremont argues that FutureSelect's WSSA claim is subject to CR 12(b)(6) dismissal because it fails to "adequately allege reasonable reliance."[74] But Tremont primarily relies upon "exculpatory" language in its sample Rye Funds partnership memoranda, limited partnership agreements, and subscription agreements, and we have determined that those sample documents are not properly considered for purposes of CR 12(b)(6).

---

[71] Clerk's Papers at 9.

[72] Clerk's Papers at 15.

[73] Clerk's Papers at 31.

[74] Br. of Resp't Tremont at 16.

Tremont also relies on federal CR 12(b)(6) case law to support its argument that FutureSelect's complaint did not contain an adequate factual basis to establish reasonable reliance.[75] But Washington State CR 12(b)(6) case law is not so strict.[76] Under Washington's liberal notice-pleading standard,[77] FutureSelect's complaint adequately states a WSSA seller claim against Tremont. RCW 21.20.010(2) prohibits making "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." The complaint also adequately alleges justifiable reliance:

> FutureSelect reasonably and justifiably relied on Tremont's misstatements when it purchased securities in Tremont by investing in the Rye Funds. FutureSelect would not have purchased the Rye Funds securities if it had been aware that Tremont had not conducted due diligence of Madoff and was not monitoring Madoff's transactions, internal controls and operational risk, or that the assets purportedly managed by Madoff on behalf of the Rye Funds did not exist, or that the trades Madoff purported to be making on behalf of the Rye Funds had not occurred.[78]

Because we determine that FutureSelect's WSSA claim against Tremont is sufficient to survive a CR 12(b)(6) motion to dismiss, we reverse the dismissal of that claim.

---

[75] Fed. R. Civ. P. 12(b)(6) permits dismissal "unless the claim is *plausibly* based upon the factual allegations in the complaint—a more difficult standard to satisfy." McCurry v. Chevy Chase Bank, FSB, 169 Wn.2d 96, 101, 233 P.3d 861 (2010).

[76] In McCurry, our Supreme Court declined to adopt the federal standard for dismissal. Id.

[77] Putman, 166 Wn.2d at 983.

[78] Clerk's Papers at 32.

D. Ernst & Young

FutureSelect alleges Ernst & Young violated the WSSA as a "seller of a security" in violation of RCW 21.20.010. A "seller" is any person who is a "substantial contributive factor in the sales transaction."[79] In order to be liable, the defendant must exhibit attributes of a seller, or be a catalyst to the sale.[80]

Ernst & Young contends FutureSelect fails to show it was a substantial contributive factor to FutureSelect's investments, and thus is not liable as a "seller" of securities under the WSSA. Quoting Hines, Ernst & Young asserts that professionals "'whose role is confined to rendering routine professional services in connection with an offer' cannot" incur seller liability under the WSSA.[81] But Hines was decided on summary judgment based on specific facts. Here, by contrast, we are reviewing FutureSelect's allegations only in the context of the more forgiving CR 12(b)(6) standards.

Due to the factual nature of the "substantial factor" test, its determination is typically inappropriate for resolution on a motion to dismiss.[82] Washington courts have typically denied motions to dismiss that challenge "seller" status when the defendant is an auditor who prepared statements that were provided to investors.[83] This is because "[t]he natural roles of . . . auditors . . .go beyond 'routine services' rendered to a client.

---

[79] Haberman, 109 Wn.2d at 131.

[80] Id.; Hines, 114 Wn.2d at 150.

[81] Br. of Resp't Ernst & Young at 21 (quoting Hines, 114 Wn.2d at 149).

[82] See Haberman, 109 Wn.2d at 132; Hoffer v. State, 110 Wn.2d 415, 430, 755 P.2d 781 (1988).

[83] See In re Metro. Sec. Litig., 532 F. Supp. 2d 1260, 1300-01 (E.D. Wash. 2007) (citing Haberman, 109 Wn.2d at 119; Hoffer, 110 Wn.2d at 417-18).

They serve the additional role of communicating to investors about corporations and their securities."[84]

Given Washington's notice pleading standard, FutureSelect adequately alleges that Ernst & Young's actions were a substantial factor in the securities sales occurring after FutureSelect received Ernst & Young's first audit. FutureSelect's complaint alleges that Ernst & Young "made untrue statements of material facts and engaged in acts of fraud and deceit upon FutureSelect . . . that were a substantial factor contributing to FutureSelect's investment in the Rye Funds."[85] FutureSelect alleges that Ernst & Young "misrepresented that they had conducted audits in conformity with" generally accepted auditing standards and "omitted material facts," including that it had not audited "Madoff's own books and records to verify the Rye Funds' assets."[86]

FutureSelect adequately alleges that it "reasonably and justifiably relied on [Ernst & Young's] misrepresentations" and "would not have invested in the Rye Funds if the funds were not audited by [Ernst & Young]."[87] FutureSelect claimed Ernst & Young "knew that its audits would be used by Tremont to solicit investors [and] also knew and intended that current investors would rely on the audits when deciding to maintain and increase their investments in the Rye Funds."[88] Ernst & Young also "knew

---

[84] Id. at 1301 (citations omitted) (citing Haberman, 109 Wn.2d at 125-26).

[85] Clerk's Papers at 36.

[86] Clerk's Papers at 21, 37. Ernst & Young certified that the Broad Market fund ended 2000 with $288 million in assets, 2001 with $364 million, 2002 with over $400 million, and 2003 with nearly $450 million. Ernst & Young certified that the Prime fund ended 2000 with $497 million in assets, 2001 with $667 million, 2002 with $750 million, and 2003 with $831 million.

[87] Clerk's Papers at 37.

[88] Clerk's Papers at 37.

[FutureSelect was] receiving and relying on its audits of the [Rye Funds]" because "[e]ach audit was addressed to the 'Partners' of the fund[s], which [Ernst & Young] knew included [FutureSelect]."[89] FutureSelect's investment "in reliance on Ernst & Young's audits totaled approximately $50 million."[90]

We reverse the dismissal of the WSSA claim against Ernst & Young. The determination of whether Ernst & Young was a substantial contributive factor to the sale requires an inquiry best conducted on specific facts.

E. Mass Mutual and Oppenheimer

FutureSelect alleges Oppenheimer and Mass Mutual were "control persons" within the meaning of RCW 21.20.430(3), had control over Tremont, and knew Tremont made false statements to FutureSelect. FutureSelect contends Mass Mutual and Oppenheimer are liable to it for Tremont's false statements.

Under RCW 21.20.430(3),

[e]very person who directly or indirectly controls a seller . . . liable under subsection (1) or (2) above . . . who materially aids in the transaction is also liable jointly and severally with and to the same extent as the seller . . . unless such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

Our Supreme Court approved a two-step test to determine whether the required control exists:

[Plaintiffs must] "establish, first, that the defendant . . . actually participated in (i.e., exercised control over) the operations of the corporation in general; then he must prove that the defendant possessed the power to control the specific transaction or activity upon which the primary violation

---

[89] Clerk's Papers at 23.

[90] Clerk's Papers at 22-23.

is predicated, but he need not prove that this later power was exercised."[91]

FutureSelect's complaint alleges Mass Mutual and Oppenheimer controlled Tremont, including "the manner by which Tremont offered investments, including the Rye Funds."[92] Specifically, FutureSelect alleges Oppenheimer was 100 percent owned by Mass Mutual and Tremont was 100 percent owned by Oppenheimer. The complaint alleges Oppenheimer and Mass Mutual actively managed marketing and solicitation of investment activity, including the Rye Funds. FutureSelect alleges that, although the Tremont board of directors changed over time, "the board always was made up of high level employees of MassMutual and Oppenheimer entities."[93] FutureSelect contends Tremont's two coprincipals also were Oppenheimer employees. Moreover, the complaint alleges Mass Mutual "was the principal of Oppenheimer and Tremont, who were MassMutual's agents, and had the *power to exercise complete control* over those entities, including control over their policies and procedures and the Rye Funds' manner by which those funds invested their assets, including with Madoff."[94]

FutureSelect also alleges Oppenheimer "actively managed" marketing and solicitation of investment activity at Tremont through selection of investment vehicles and due diligence programs.[95]

---

[91] Hines, 114 Wn.2d at 136 (emphasis omitted) (internal quotation marks omitted) (quoting Metge v. Baehler, 762 F.2d 621, 631 (8th Cir.1985)); see also Herrington v. David D. Hawthorne, CPA, PS, 111 Wn. App. 824, 835-36, 47 P.3d 567 (2002) (Hines adopted the two-step test and rejected the Ninth Circuit "culpable participation" test requiring a finding that the control person culpably participated in the transaction.)

[92] Clerk's Papers at 15.

[93] Clerk's Papers at 18-19.

[94] Clerk's Papers at 20 (emphasis added).

[95] Clerk's Papers at 33.

Mass Mutual and Oppenheimer contend FutureSelect does not adequately allege that they "actually participated" in Tremont's operation or possessed the power to control Tremont's solicitation and sale of Rye Fund securities to FutureSelect by failing to state "'the specific transaction or activity upon which the primary [WSSA] violation is predicated.'"[96]

But Mass Mutual and Oppenheimer overstate the degree of specificity required. Under CR 12(b)(6) pleading standards, FutureSelect's complaint adequately alleges "control person" claims that Mass Mutual and Oppenheimer "actually participated" in Tremont's operations in general and possessed the power to control the specific transaction or activity upon which the primary violation is predicated.

We reverse the dismissal of FutureSelect's WSSA claims against Mass Mutual and Oppenheimer.

*Tort Claims*

A. Negligent Misrepresentation—Tremont

A plaintiff claiming negligence must prove by clear, cogent, and convincing evidence that the defendant, in the course of its "'business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplie[d] false information for the guidance of others in their business transactions'"; the defendant "'fail[ed] to exercise reasonable care or competence in obtaining or communicating the information'"; and the loss to the plaintiff was caused "'by their justifiable reliance upon the information'" communicated by the defendant.[97]

---

[96] Br. of Resp't Mass Mutual at 31 (quoting Hines, 114 Wn.2d at 136).

[97] Haberman, 109 Wn.2d at 161-62 (quoting RESTATEMENT (SECOND) OF TORTS § 552(1) (1977)).

Liability for negligent misrepresentation is limited to cases where

(1) the defendant has knowledge of the specific injured party's reliance; or (2) the plaintiff is a member of a group that the defendant seeks to influence; or (3) the defendant has special reason to know that some member of a limited group will rely on the information.[98]

FutureSelect alleges Tremont supplied it with false information, including statements that "Tremont had conducted due diligence on Madoff, was familiar with Madoff's operations, and was monitoring Madoff's transactions, internal controls, and operational risk; that the assets purportedly managed by Madoff on behalf of the Rye Funds existed and were appreciating; and that the trades Madoff purported to be making on behalf of Rye Funds occurred."[99]

In addition to claiming "Tremont had explained how it exercised oversight over Madoff"[100] repeatedly from the initial 1997 communication, the complaint quotes from Tremont's July 10, 2001 letter to FutureSelect specifying procedures for monitoring Madoff:

> "Each month Tremont analyzes every account [held with Madoff]. We record the purchases and sales by security and analyze whether the purchase and sale orders on the individual securities were within the published trading range that particular day. We also analyze the trading volume by stock to calculate the percentage of the overall activity. Once we have reviewed each account, we then compare the accounts to each other to insure that all accounts are treated equally."[101]

The complaint further states,

> Tremont also stated that it had hired a company called Adviserware to do all the accounting [of Madoff accounts] independent of Tremont's review. They prepare the balance sheet, partnership reconciliation and statement.

---

[98] Id. at 162-63.

[99] Clerk's Papers at 42-43.

[100] Clerk's Papers at 12.

[101] Clerk's Papers at 12.

They also price the portfolio using a third party pricing system to verify the value of the total portfolio.[102]

The complaint also alleges that Tremont "knew and intended to supply such information for the benefit and guidance of FutureSelect in making its investment decisions regarding the Rye Funds," that FutureSelect "justifiably relied on Tremont's false information," and that FutureSelect was damaged as a result.[103] According to the complaint,

> [i]f Tremont had actually conducted the due diligence and monitoring of Madoff that it claimed, it would have discovered the fraud. Tremont should have known that the only evidence of the assets Madoff purportedly held and the trades Madoff purportedly executed for the benefit of the Rye Funds was from Madoff himself and that those assets and trades could not be confirmed by independent third parties.[104]

Tremont contends the claim is barred by the exculpatory clauses in the sample documents it submitted (the limited partnership agreements, the partnership memoranda, and the subscription agreements). But those limited documents are not pertinent to our CR 12(b)(6) review, for the reasons stated above.

FutureSelect's complaint adequately alleges Tremont's negligent misrepresentation. We reverse the dismissal of FutureSelect's claim for negligent misrepresentation as against Tremont.

B. Negligence—Tremont

FutureSelect's claim for negligence alleges Tremont owed it a fiduciary duty of care as managing partner of the Rye Funds and failed to exercise reasonable care by not overseeing Madoff's management of FutureSelect's investments in the Rye Funds.

---

[102] Clerk's Papers at 13 (internal quotation marks omitted).

[103] Clerk's Papers at 43.

[104] Clerk's Papers at 14-15.

Standing to assert the negligence claim depends on whether the claim is direct or derivative. Plaintiffs alleging an injury arising solely from an ownership interest in the company do not assert direct claims because their harm is secondary to the direct harm to the company.[105] Under Delaware law, to determine whether a claim is direct or derivative,

> a court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.[106]

The injury FutureSelect suffered as a result of the alleged negligent management was solely the pro rata loss of the decline in the Rye Funds' value and was secondary to the direct injury to the Rye Funds. FutureSelect's allegations do not demonstrate that the injury it suffered was independent of the injury to all Rye Funds partners caused by the same alleged breach. Under Delaware law, FutureSelect's claim is derivative.

FutureSelect lacks standing to assert the claim on behalf of the Rye Funds.[107]

We affirm the trial court's dismissal of FutureSelect's negligence claim against Tremont.

---

[105] Feldman v. Cutaia, 951 A.2d 727, 733 (Del. 2008).

[106] Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1039 (Del. 2004).

[107] Under Delaware law, where "all of a corporation's shareholders are harmed and would recover pro rata in proportion with their ownership [interest]," the claim is derivative. Feldman, 951 A.2d at 733. Such derivative claims may be pursued only by the partnership and not by individual investors. See, e.g., Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 351-53 (Del. 1988).

C. Agency—Mass Mutual and Oppenheimer

FutureSelect alleges Mass Mutual and Oppenheimer are liable for Tremont's

negligent misrepresentations under the theory of agency.[108] The extent of control

exercised by the principal over an agent is essential in determining liability:

> When we distill the principles evident in our case law, the proper inquiry
> becomes whether there is a retention of the right to direct the manner in
> which the work is performed, not simply whether there is an actual
> exercise of control over the manner in which the work is performed.[109]

Whether or not a principal-agent relationship exists is generally a question of

fact.[110] The right to control is determined by factors such as the conduct of the parties,

the contract between them, and the right of the principal to interfere in the independent

contractor's work.[111]

FutureSelect's complaint adequately states a claim against Mass Mutual and

Oppenheimer based on agency. FutureSelect alleges that in 2001, Tremont came

under their control, which included the manner by which Tremont offered investments,

including the Rye Funds.[112]

FutureSelect alleges Mass Mutual and Oppenheimer "learned of Tremont's

enormous exposure with Madoff [and] that Tremont's representations to the Rye Funds'

---

[108] Mass Mutual argues that the complaint as drafted conflates the entities Mass Mutual Holdings and Mass Mutual Life Insurance. But Mass Mutual makes no compelling argument that more precise references to those two entities in the complaint would have any significant impact upon the outcome under the applicable CR 12(b)(6) standards.

[109] Kamla v. Space Needle Corp., 147 Wn.2d 114, 121, 52 P.3d 472 (2002).

[110] O'Brien v. Hafer, 122 Wn. App. 279, 284, 93 P.3d 930 (2004).

[111] See Arnold v. Saberhagen Holdings, Inc., 157 Wn. App. 649, 664, 240 P.3d 162 (2010).

[112] According to the complaint, "Oppenheimer was the MassMutual subsidiary designated to pursue a deal [to purchase] Tremont." Clerk's Papers at 16.

32

investors regarding its oversight and monitoring of Madoff were false or, at a minimum, highly suspect."[113] The complaint states, "MassMutual and Oppenheimer knew firsthand that Tremont had little to no ability to oversee and monitor Madoff's operations."[114]

FutureSelect's complaint alleges details of Mass Mutual's and Oppenheimer's control of Tremont:

> At the time of the Tremont acquisition, MassMutual controlled Oppenheimer [and] OppenheimerFunds, another subsidiary of Oppenheimer, and that control included the manner in which Tremont solicited its investment business. Specifically, MassMutual and Oppenheimer had the right to control Tremont such that they could have prevented Tremont from offering investments with Madoff.

> . . . Once Oppenheimer's acquisition of Tremont ended in October 2001, Tremont's operations—including the marketing and investment activities of the Rye Funds—were brought directly under the MassMutual umbrella. MassMutual and Oppenheimer directed and influenced the management of the company and provided extensive support services to Tremont, including compliance, audit, finance and human resources.

> . . . Tremont's management structure was overhauled to reflect MassMutual's and Oppenheimer's deep involvement in and control over its operations.

> . . . Specifically, as part of the acquisition, all five of Tremont's board members became MassMutual, Oppenheimer and/or OppenheimerFunds employees. John V. Murphy, a MassMutual executive vice president and Oppenheimer director (as well as chairman, CEO and president of OppenheimerFunds) was named a director of Tremont. Kurt Wolfgruber, management director and assistant treasurer of Oppenheimer (as well as president, chief investment officer and director of OppenheimerFunds) and Howard E. Gunton, executive vice president and chief financial officer of MassMutual, both became Tremont directors.

> . . . Further, as part of the acquisition, Sandra Manzke and Robert Schulman, Tremont's co-chief executive officers and board members, became employees of OppenheimerFunds.

---

[113] Clerk's Papers at 17.

[114] Clerk's Papers at 17.

> . . . Though there were changes in the directors on the Tremont board over time, post-acquisition, the board always was made up of high level employees of MassMutual and Oppenheimer entities. As board members, they had ultimate control over the manner of Tremont's investment strategy.
>
> . . . .
>
> . . . Lynn Oberist Keaton, who served as a senior vice president of OppenheimerFunds, served as Tremont's chief financial officer and a senior vice president from 2005 through 2007. Margaret Weaver, an OppenheimerFunds employee, served as a senior vice president of Tremont and was described as a member of the "Tremont management team" on Tremont's website.[115]

FutureSelect expressly alleges that Oppenheimer did in fact control Tremont:

> At all relevant times, Oppenheimer had the power, both direct and indirect, to control Tremont and in fact did exercise such control:
>
> . . . .
>
> . . . Oppenheimer actively managed the marketing and solicitation of investment activity at Tremont, including through selection of investment vehicles and due diligence programs.[116]

FutureSelect's complaint and hypothetical facts support the claim that Oppenheimer and Mass Mutual controlled Tremont and retained the right to direct the manner in which Tremont's work was performed. While mere overlapping of directors and officers would not establish liability, the alleged dual roles of Tremont directors and officers who were simultaneously employees, directors, or officers of Mass Mutual or Oppenheimer, if true, could be consistent with FutureSelect's theory that Mass Mutual and Oppenheimer had control of Tremont's affairs, including the offering and management of the Rye Funds securities.[117] These allegations go beyond a pure

---

[115] Clerk's Papers at 17-19.

[116] Clerk's Papers at 33.

[117] FutureSelect contends that Oppenheimer was "100% owned by MassMutual," and Tremont was "100% owned by Oppenheimer." Clerk's Papers at 34. FutureSelect

34

parent/subsidiary relationship and, for purposes of CR 12(b)(6), support a claim that Mass Mutual and Oppenheimer controlled Tremont's Rye Funds transactions with FutureSelect.

Because FutureSelect's negligent misrepresentation claim against Tremont is sufficient for purposes of a CR 12(b)(6) ruling, we reverse the dismissal of the claims against Oppenheimer and Mass Mutual based on actual agency for Tremont's alleged misrepresentations.

### D. Apparent Agency—Mass Mutual and Oppenheimer

FutureSelect contends Mass Mutual's and Oppenheimer's statements and conduct conveyed that Tremont had the authority to offer and sell the Rye Funds on their behalf. "Apparent agency occurs, and vicarious liability for the principal follows, where a principal makes objective manifestations leading a third person to believe the wrongdoer is an agent of the principal."[118] Whether apparent authority exists is ordinarily a question of fact.[119]

In support of its apparent agency claims, FutureSelect contends Mass Mutual marketed Tremont as a "member of the MassMutual family of companies" and listed Tremont in its annual reports as one of its "General Agencies and Other Offices."[120] FutureSelect alleges these statements "conveyed to FutureSelect that Tremont had the

---

also alleges that all five of Tremont's directors and both of its co-principals were Oppenheimer and MassMutual employees.

[118] D.L.S. v. Maybin, 130 Wn. App. 94, 98, 121 P.3d 1210 (2005) (trial court properly dismissed claim against franchisor based on claim of apparent agency relationship with franchisee); RESTATEMENT (SECOND) OF AGENCY § 267 (1958).

[119] See, e.g., Mohr v. Grantham, 172 Wn.2d 844, 860-61, 262 P.3d 490 (2011); Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 555, 192 P.3d 886 (2008).

[120] Clerk's Papers at 20.

authority to offer and sell the Rye Funds' investments on MassMutual's behalf," "led FutureSelect to believe that Tremont had the authority to so act," and "would have led a reasonably careful person under the circumstances" to believe that Tremont had such authority.[121]

These allegations could potentially establish that Mass Mutual held out Tremont as its agent and that FutureSelect reasonably believed the statements. The claim of apparent agency against Mass Mutual is sufficient for purposes of CR 12(b)(6). Accordingly, we conclude that the claim should not have been dismissed under CR 12(b)(6).

FutureSelect fails to identify any actions by Oppenheimer manifesting such an apparent agency. FutureSelect contends that while under Mass Mutual's and Oppenheimer's control, Tremont represented itself as "[a]n Oppenheimer Funds [c]ompany" on its stationery and marketing materials and listed Mass Mutual, Oppenheimer, and OppenheimerFunds as "control persons" of Tremont in documents filed with the Securities and Exchange Commission.[122] But Tremont's representations purportedly manifesting its apparent agency are not attributable to Oppenheimer as principal.[123] We conclude that the complaint does not set forth a claim against Oppenheimer for which relief can be granted on the basis of apparent agency.

These manifestations by Tremont are insufficient to demonstrate the existence of an apparent agency relationship between Oppenheimer and Tremont, even when

---

[121] Clerk's Papers at 41.

[122] Clerk's Papers at 19.

[123] See, e.g., Estep v. Hamilton, 148 Wn. App. 246, 258, 201 P.3d 331 (2008); Mauch v. Kissling, 56 Wn. App. 312, 316, 783 P.2d 601 (1989) ("Apparent authority can only be inferred from the acts of the principal and not from the acts of the agent.").

considering hypothetical facts. FutureSelect's apparent agency claim against Oppenheimer was properly dismissed.

We reverse the dismissal of FutureSelect's apparent agency claim against Mass Mutual as to Tremont's negligent misrepresentation but affirm dismissal of its apparent agency claim against Oppenheimer.

### E. Negligent Misrepresentation—Ernst & Young

Accountants may face liability for negligent misrepresentation in audit reports,[124] provided that the maker of the representation knows that its recipient intended to transmit the information to a similar person, persons, or group.[125]

FutureSelect's complaint alleges Ernst & Young "made untrue statements of material facts and engaged in acts of fraud and deceit upon FutureSelect . . . that were a substantial factor contributing to FutureSelect's investment in the Rye Funds."[126] Specifically, Ernst & Young "misrepresented that they had conducted audits in conformity with" generally accepted auditing standards and "omitted material facts."[127] FutureSelect asserts that it acted in reliance upon the misrepresentations and that its investments made "in reliance on Ernst & Young's audits totaled approximately $50

---

[124] See ESCA Corp. v. KPMG Peat Marwick, 135 Wn.2d 820, 828, 959 P.2d 651 (1998) (accounting firm found liable to bank for negligent misrepresentation contained in audit of customer to whom bank loaned money).

[125] Haberman, 109 Wn.2d at 163 (quoting RESTATEMENT (SECOND) OF TORTS § 552 cmt. h (1977)).

[126] Clerk's Papers at 36.

[127] Clerk's Papers at 21, 37. Ernst & Young certified that the Broad Market fund ended 2000 with $288 million in assets, 2001 with $364 million, 2002 with over $400 million, and 2003 with nearly $450 million. Ernst & Young certified that the Prime fund ended 2000 with $497 million in assets, 2001 with $667 million, 2002 with $750 million, and 2003 with $831 million.

million."[128] FutureSelect contends that Ernst & Young "knew that its audits would be used by Tremont to solicit investors" and "knew and intended that current investors would rely on the audits when deciding to maintain and increase" their investments in the Rye Funds.[129] Ernst & Young knew FutureSelect was "receiving and relying on its audits of the [Rye] funds," because "each audit was addressed to the 'Partners' of the fund[s], which [Ernst & Young] knew included [FutureSelect]."[130]

These allegations and consistent hypothetical facts state a claim that (1) Ernst & Young supplied false information for the guidance of FutureSelect in their investments, (2) Ernst & Young knew or should have known that the information it supplied to Tremont was intended by Tremont to guide FutureSelect in its investments, (3) Ernst & Young was negligent in obtaining or communicating false information, (4) FutureSelect relied on the false information, (5) FutureSelect's reliance was reasonable, and (6) the false information proximately caused FutureSelect's damages. We conclude that FutureSelect's complaint is adequate for purposes of CR 12(b)(6) to state a claim for negligent misrepresentation against Ernst & Young.

We reverse the trial court's dismissal of FutureSelect's negligent misrepresentation claim against Ernst & Young.

*FutureSelect's Motion to Amend Complaint*

FutureSelect contends this court should allow it to amend its complaint to correct any CR 12(b)(6) deficiencies but does not provide compelling authority for such relief on appeal, especially where it makes no showing in this court, or in the trial court, that it

---

[128] Clerk's Papers at 22-23.

[129] Clerk's Papers at 37.

[130] Clerk's Papers at 23.

has grounds for a good faith amendment that would address the deficiencies we have identified.[131] The motion is denied.

*Long-Arm Jurisdiction over Oppenheimer*

Oppenheimer argues that it is not subject to personal jurisdiction in Washington because it had no contacts with Washington and that FutureSelect's claims are nothing more than an attempt to hold a parent company liable for the acts of its subsidiary. Oppenheimer contends that an assertion of personal jurisdiction based upon acts of its subsidiary does not comport with constitutional due process requirements. These arguments are not persuasive.

The plaintiff has the burden of demonstrating jurisdiction, but when a motion to dismiss for lack of personal jurisdiction is resolved without an evidentiary hearing "'only a prima facie showing of jurisdiction is required.'"[132] In this setting, "[w]e treat the allegations of the complaint as true."[133]

Personal jurisdiction over a nonresident defendant may be general or specific.[134] If a nonresident is doing business in this state on a substantial and continuous basis, then the courts may exercise general jurisdiction over the defendant as to any cause of action.[135] The courts may gain specific personal jurisdiction over a nonresident based

---

[131] CR 15(a) states, in pertinent part, "If a party moves to amend a pleading, a copy of the proposed amended pleading, denominated 'proposed' and unsigned, shall be attached to the motion."

[132] Precision Lab. Plastics, Inc. v. Micro Test, Inc., 96 Wn. App. 721, 725, 981 P.2d 454 (1999) (quoting MBM Fisheries, Inc. v. Bollinger Mach. Shop & Shipyard, Inc., 60 Wn. App. 414, 418, 804 P.2d 627 (1991)).

[133] SeaHAVN, Ltd. v. Glitnir Bank, 154 Wn. App. 550, 563, 226 P.3d 141 (2010).

[134] CTVC of Hawaii Co. v. Shinawatra, 82 Wn. App. 699, 708, 919 P.2d 1243 (1996).

[135] Id.

on much more limited contacts with Washington, but specific jurisdiction extends only to causes of action that arise out of those limited contacts.[136] FutureSelect claims specific jurisdiction over Oppenheimer based on the Washington contacts of Tremont acting as its agent.

Similar to many states, Washington's long-arm statute expressly provides that agency is a proper means for asserting personal jurisdiction over a principal for a cause of action that arises out of the agent transacting business or committing a tort in Washington:

> Any person, whether or not a citizen or resident of this state, who in person *or through an agent* does any of the acts in this section enumerated, thereby submits said person . . . to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any said acts:
>
> (a) The transaction of any business within this state;
>
> (b) The commission of a tortious act within this state.[137]

The Washington long-arm statute "extends jurisdiction to the limit of federal due process."[138] We apply three factors to the due process inquiry:

> "(1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and

---

[136] Id. at 709.

[137] RCW 4.28.185(1) (emphasis added).

[138] Shute v. Carnival Cruise Lines, 113 Wn.2d 763, 771, 783 P.2d 78 (1989).

protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation."[139]

The long-arm jurisdiction question presented is whether a subsidiary acting as the agent for its parent subjects the parent to long-arm jurisdiction for claims arising out of the agent's transactions and torts in Washington. Oppenheimer argues that mere agency is inadequate and that due process requires that the subsidiary be the alter ego of the parent, allowing the corporate veil to be pierced. Only then could contacts by the subsidiary be imputed to the parent for purposes of long-arm jurisdiction.

Historically, the acts of a subsidiary do not subject the parent corporation to general jurisdiction, sometimes referred to as the Cannon doctrine.[140] Several exceptions to the Cannon doctrine have developed over time.[141] In International Shoe Co. v. Washington, the United States Supreme Court departed from the fiction of "presence" and concluded that for specific jurisdiction purposes, due process is properly measured in terms of minimum contacts:

> Since the corporate personality is a fiction, although a fiction intended to be acted upon as though it were a fact, it is clear that unlike an individual its "presence" without, as well as within, the state of its origin can be manifested only by activities carried on in its behalf by those who are authorized to act for it. To say that the corporation is so far "present" there as to satisfy due process requirements, for purposes of . . . the maintenance of suits against it in the courts of the state, is to beg the question to be decided. For the terms "present" or "presence" are used merely to symbolize those activities of the corporation's agent within the state which courts will deem to be sufficient to satisfy the demands of due process. Those demands may be met by such contacts of the corporation

---

[139] Precision Lab. Plastics, 96 Wn. App. at 726 (emphasis omitted) (quoting Tyee Constr. Co. v. Dulien Steel Prods., Inc., 62 Wn.2d 106, 115-16, 381 P.2d 245 (1963)).

[140] Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S. Ct. 250, 69 L. Ed. 634 (1925).

[141] See 14 KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 4:27, at 117 (2d ed. 2009).

with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there.[142]

Few Washington cases discuss the impact of the parent-subsidiary relationship upon personal jurisdiction, and those discussions focus upon general, rather than specific, jurisdiction.[143] But Washington's long-arm statute expressly provides for jurisdiction based on agency, and Washington courts have acknowledged that principle.[144]

Both Oppenheimer and FutureSelect point to federal case law, where numerous cases hold a subsidiary's contacts should or should not be imputed to the parent for personal jurisdiction.[145] Many of those cases involve concepts of doing business for

---

[142] 326 U.S. 310, 316-17, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (citations omitted).

[143] See Williams v. Canadian Fishing Co., 8 Wn. App. 765, 768, 509 P.2d 64 (1973) ("We agree with respondent that ownership of a subsidiary by a parent, with nothing more, is not sufficient to constitute 'doing business' for jurisdictional purposes. Although in the case at bar the parent and subsidiary corporations share a common director, there is no showing in the record that the officers of the subsidiary do not act independently of the parent corporation or that the subsidiary is a 'mere instrumentality' of the parent." (citations omitted)); State v. Nw. Magnesite Co., 28 Wn.2d 1, 41, 182 P.2d 643 (1947) ("it is the general rule that a foreign corporation which holds a controlling interest in a subsidiary corporation doing business within a particular state is not thereby subject to service of process through service upon an agent of the subsidiary within that state"); Osborne v. Spokane, 48 Wn. App. 296, 299, 738 P.2d 1072 (1987) ("A foreign corporation is not 'doing business' in this state for purposes of jurisdiction merely because it is a wholly owned subsidiary of a domestic corporation."); see 14 TEGLAND, supra, §§ 4:27, 4:30, at 117-18, 120-22.

[144] See, e.g., CTVC, 82 Wn. App. at 717 (plaintiffs sued an individual and two corporations controlled by the individual and relied upon two contacts by the individual to support long-arm jurisdiction; court concluded agent can subject principal to long-arm jurisdiction).

[145] See, e.g., 4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1069.4 nn.2 & 10 (3d ed. 2002 & Supp. 2013) (illustrative cases where federal courts have exercised or declined to exercise personal jurisdiction based on subsidiary contacts).

purposes of general jurisdiction, but some also apply the same standards to long-arm

issues. Many federal courts recognize an alter ego standard, often related to piercing

the corporate veil concepts. Some include an agency standard. Widely discussed, but

not so widely adopted, is a merger (alter ego) and attribution (agency) framework.[146]

Some decry the conflation of the liability concept of alter ego/piercing the corporate veil

with the jurisdiction "minimum contacts" question.[147] The Ninth Circuit Court of Appeals

in particular has refined its analysis to acknowledge both an alter ego test and an

agency test.[148] The Ninth Circuit's agency test requires a showing of "significant

importance," i.e., that the business activity of the subsidiary is so important to the

principal that in the absence of a subsidiary, the principal would engage in the same

business activity itself.[149] The Ninth Circuit further refined the significant importance

test to clarify it is not necessary that the parent would undertake the agent's activities

itself:

> For the agency test, we ask: Are the services provided by [the subsidiary]
> sufficiently important to the [parent] that if [the subsidiary] went out of

---

[146] In re Telectronics Pacing Sys., Inc., 953 F. Supp. 909, 918 (S.D. Ohio 1997) ("We find persuasive the view that International Shoe has supplanted Cannon in the context of personal jurisdiction. . . . [T]he formalistic alter ego principles of Cannon are no longer applicable in the analysis of whether the exercise of personal jurisdiction over a foreign corporation is constitutional.").

[147] Id. at 916 ("Many courts, however continue to conflate the requirements of due process and the alter ego doctrine.")

[148] Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 419-20 (9th Cir. 1977) (specific jurisdiction); Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1404-06 (9th Cir. 1994) (specific jurisdiction); Bauman v. DaimlerChrysler Corp., 644 F.3d 909, 920-22 (9th Cir. 2011) (general jurisdiction); Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd., 243 F. Supp. 2d 1073, 1098-1100 (C.D. Cal. 2003) (specific jurisdiction); John Doe I v. Unocal Corp., 248 F.3d 915, 923-30 (9th Cir. 2001) (both).

[149] Chan, 39 F.3d at 1404-06; Unocal, 248 F.3d at 923-30; Wells Fargo, 556 F.2d at 419-20.

business, [the parent] would continue [the business activity] itself, or alternatively by selling them through a new representative?[150]

But the court acknowledged a "lack of clarity and consistency" on this question.[151]

Against this backdrop, we turn to the application of the minimum contacts standard to analyze the due process limits for specific jurisdiction.[152]

A. Purposeful Availment

To establish specific personal jurisdiction under RCW 4.28.185(1)(a) by transacting business in Washington, FutureSelect must show that Oppenheimer "'purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thereby invoking the benefits and protections of its laws.'"[153] Deliberately engaging in significant business activities within a state is adequate.[154]

The purposeful availment analysis in the tort context permits the exercise of jurisdiction when the claimant makes a prima facie showing that an out-of-state party's intentional actions were expressly aimed at the forum state and caused harm in the forum state.[155] Where defendants "'purposefully derive benefit' from their interstate

---

[150] Bauman, 644 F.3d at 920.

[151] Id. at 922 n.13.

[152] Refreshingly, one district court in the Western District of Washington has reconciled the Ninth Circuit alter ego analysis with the minimum contacts standard. See Langlois v. Déjà Vu, Inc., 984 F. Supp. 1327, 1338 (W.D. Wash. 1997) (court "convinced that the analysis actually applied by the Ninth Circuit is a minimum contacts analysis").

[153] SeaHAVN, 154 Wn. App. at 564 (alteration in original) (quoting Walker v Bonney-Watson Co., 64 Wn. App. 27, 34, 823 P.2d 518 (1992)).

[154] Id. at 564-65 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)).

[155] See Precision Lab. Plastics, 96 Wn. App. at 727-28; Kysar v. Lambert, 76 Wn. App. 470, 487, 887 P.2d 431 (1995).

activities, it would be unfair to allow them to escape the consequences that proximately arise from these activities in other jurisdictions."[156]

Based upon the complaint, Tremont clearly had significant contacts with Washington. Oppenheimer argues its parent-subsidiary relationship with Tremont is insufficient to attribute the minimum contacts of the subsidiary to the parent. But FutureSelect's complaint alleges Oppenheimer's involvement with Tremont was much more than a standard parent-subsidiary relationship.

Consistent with International Shoe, we must focus upon the alleged activities of Oppenheimer. FutureSelect alleges that Oppenheimer controlled the manner in which Tremont solicited its Rye Fund investments and that Oppenheimer "actively managed the marketing and solicitation of investment activity at Tremont, including . . . selection of investment vehicles and due diligence programs."[157] FutureSelect further alleges that Oppenheimer and Mass Mutual benefited from the Tremont operations they controlled, with up to $29 million in fees generated by the Rye Funds in 2007 alone.

Soliciting Rye Funds investors, marketing the funds' access to Madoff, and making representations about the due diligence programs used to monitor those funds are key to Tremont's business and central to the claims asserted by FutureSelect. Oppenheimer's alleged active management and control of those activities is significant in terms of Tremont's success, the financial rewards to Oppenheimer, and the impact on FutureSelect. Whether or not Oppenheimer itself would have engaged in the activities of Tremont or would have found another to solicit and market Madoff feeder funds, the

---

[156] Grange Ins. Ass'n v. State, 110 Wn.2d 752, 760, 757 P.2d 933 (1988) (internal quotation marks omitted) (quoting Burger King, 471 U.S. at 473-74).

[157] Clerk's Papers at 33.

alleged activities of Oppenheimer directed to and impacting Washington are significant and purposeful.

Oppenheimer argues that a plaintiff may not use a liability theory as a substitute for personal jurisdiction. While liability theories should not be conflated with jurisdiction standards, the application of the due process purposeful availment standard may include practical policy considerations. In Harbison v. Garden Valley Outfitters, Inc., the court considered the successor liability of one corporation for the acts of another when deciding whether to impute the predecessor's contacts to the successor for purposes of long-arm jurisdiction:

> The rationale of substantive successor liability is equally applicable to the question of personal jurisdiction. When a successor has assumed its predecessor's liabilities, the forum-related contacts of the predecessor should be attributed to the successor for jurisdictional purposes. This is because the assets purchased by the successor were, in part, derived from the forum, and the successor presumably had knowledge thereof. We perceive no policy basis in such a case for insulating the successor entity from liability in the same jurisdiction where its predecessor would have been exposed.[158]

Similarly, FutureSelect's complaint alleges a viable claim that Oppenheimer was not merely a parent corporation but actively controlled and managed key marketing and solicitation activities of Tremont as its agent. The alleged activity is purposeful. Oppenheimer benefited from the acts of its agent in Washington. There is no policy basis for insulating Oppenheimer from liability in the same jurisdiction where its alleged agent transacted business and committed torts.

The complaint alleges that Oppenheimer deliberately engaged in significant transactions in Washington through its agent, Tremont, by controlling and actively

---

[158] 69 Wn. App. 590, 599, 849 P.2d 669 (1993) (citation omitted).

managing Tremont's marketing and solicitation of investments aimed at FutureSelect. And the misrepresentations arising out of Tremont's business transactions had a significant impact on FutureSelect in Washington. We conclude that the complaint makes a prima facie showing of purposeful availment by Oppenheimer.

## B. Claim Arises Out of Oppenheimer's Forum-Related Activities

FutureSelect alleges it was harmed by Tremont's acts in Washington, committed as Oppenheimer's agent. As a general rule, a business entity suffers harm at its principal place of business.[159] Our Supreme Court "has held many times that when an injury occurs in Washington, it is an inseparable part of the 'tortious act' and that act is deemed to have occurred in this state for purposes of the long-arm statute."[160] There is a prima facie showing that the causes of action arise out of the contacts in Washington.

## C. Notions of Fair Play and Substantial Justice

Finally, we look to the nature, quality, and extent of Oppenheimer's activity in this state; the convenience of the parties; the benefits and protections of Washington law; "'and the basic equities of the situation.'"[161] Oppenheimer makes no showing that litigation in Washington would be "so gravely difficult and inconvenient" that it is unfairly at a "severe disadvantage" in comparison to its opponent.[162] On the other hand,

---

[159] SeaHAVN, 154 Wn. App. at 570 n.3.

[160] Grange Ins. Ass'n, 110 Wn.2d at 757.

[161] Precision Lab. Plastics, 96 Wn. App. at 726 (quoting Tyee Constr., 62 Wn.2d at 116).

[162] Burger King, 471 U.S. at 478; Bauman, 644 F.3d at 925 (burden on defendant, a large corporation, to litigate the case in another state "is not so weighty as to preclude jurisdiction—particularly since 'modern advances in communications and transportation have significantly reduced the burden of litigating'" in a foreign state (quoting Sinatra v. Nat'l Enquirer, Inc., 854 F.2d 1191, 1199 (9th Cir. 1988))).

Washington has a legitimate interest in holding a defendant answerable on a claim related to its Washington contacts.[163]

Due process would not be satisfied by mere allegations that Tremont is a subsidiary of Oppenheimer. Neither would a generic allegation of an agency relationship suffice. An allegation that the parent has the power to control the subsidiary but was oblivious to or failed to monitor the conduct of the subsidiary would not be compelling. Here, FutureSelect alleges Oppenheimer is actively controlling and managing key activities of its subsidiary, the subsidiary is acting as its agent in Washington, those activities are financially significant to Oppenheimer, FutureSelect's claims arise out of those activities, and the activities significantly impacted FutureSelect in Washington.

The assertion of specific personal jurisdiction over Oppenheimer satisfies the "through an agent" provision of the long-arm statute and comports with due process.

## CONCLUSION

The court has personal jurisdiction over Oppenheimer. We conclude that FutureSelect's WSSA claims against all respondents, FutureSelect's negligent misrepresentation claims against Tremont and Ernst & Young, its actual agency claims against Mass Mutual and Oppenheimer, and its apparent agency claim against Mass Mutual are sufficient to survive the respondents' CR 12(b)(6) challenges. We reverse the dismissal of those claims.

---

[163] Precision Lab Plastics, 96 Wn. App. at 729-30; see also McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957) (a state frequently will have a "manifest interest in providing effective means of redress for its residents").

We affirm the dismissal of FutureSelect's apparent agency claim against Oppenheimer and its negligence claim against Tremont.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

WE CONCUR:

Leach, C.J.

Cox, J.